# UNITED STATES NAVY–MARINE CORPS
# COURT OF CRIMINAL APPEALS

————————————————

**No. 201400241**

————————————————

### UNITED STATES OF AMERICA
Appellee

v.

### DAVID MONTALVO III
Lance Corporal (E-3), U.S. Marine Corps
Appellant

————————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Lieutenant Colonel C.J. Thielemann,
U.S. Marine Corps.
For Appellant: James S. Trieschmann, Jr., Esq.; Lieutenant
Christopher C. McMahon, JAGC, U.S. Navy.
For Appellee: Major Cory A. Carver, U.S. Marine Corps; Lieutenant
James M. Belforti, JAGC, U.S. Navy.

————————————————

Decided 15 December 2016

————————————————

Before CAMPBELL, RUGH, and HUTCHISON, *Appellate Military Judges*

————————————————

**This opinion does not serve as binding precedent, but may be cited
as persuasive authority under NMCCA Rule of Practice and
Procedure 18.2.**

————————————————

RUGH, Judge:

A general court-martial consisting of officer and enlisted members
convicted the appellant, contrary to his pleas, of two specifications of
rape in violation of Article 120, Uniform Code of Military Justice
(UCMJ), 10 U.S.C. § 920. The members sentenced the appellant to
nine years' confinement, reduction to pay grade E-1, and a
dishonorable discharge. The convening authority (CA) approved the
sentence as adjudged.

The appellant originally raised two assignments of error (AOE): (1) that the military judge erred by denying the appellant's request for a continuance[1] and (2) that the appellant was denied his Sixth Amendment right to effective counsel in the post-trial phase of his court-martial.[2]

On 27 May 2015 this court found merit in AOE (1) and set aside the findings and sentence.[3] However, on 10 July 2015 we reconsidered our decision and returned the record for a hearing held pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967). On 3 February 2016 we returned the record for an additional *DuBay* hearing, and the record and results of the hearing were returned to us on 29 April 2016.

The appellant now raises as supplemental error that the military judge erred in the findings instructions provided to the court-martial members.[4]

---

[1] I. WHETHER THE MILITARY JUDGE ERRED IN LIMITING [THE APPELLANT'S] CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE BY DENYING A REQUEST FOUR DAYS BEFORE TRIAL FOR A CONTINUANCE TO INVESTIGATE NEWLY DISCOVERED INFORMATION WHEN SUCH INFORMATION WAS RECEIVED LATE DUE TO GOVERNMENT'S FAILURE TO TIMELY COMPLY WITH THE RULES OF DISCOVERY AND THE DEFENSE WAS OTHERWISE INCAPABLE OF DISCOVERING THIS INFORMATION BECAUSE THEY WERE PROHIBITED FROM QUESTIONING THE ALLEGED VICTIM.

[2] II. WHETHER [THE APPELLANT] WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL IN THE POST-TRIAL PHASE OF HIS COURT-MARTIAL WHEN DEFENSE COUNSEL FAILED TO REQUEST DEFERMENT OF CONFINEMENT AND DEFERMENT IN REDUCTION OF RANK DESPITE THE FACT THAT [THE APPELLANT] SPECIFICALLY REQUESTED THAT THEY DO SO.

[3] *United States v. Montalvo*, No. 201400241, 2015 CCA LEXIS 218 (N-M. Ct. Crim. App. 27 May 2015).

[4] III. THE MILITARY JUDGE IS REQUIRED TO ACCURATELY INSTRUCT THE MEMBERS ON THE LAW. HERE, THE MILITARY JUDGE INSTRUCTED THE MEMBERS, "IF, BASED ON YOUR CONSIDERATION OF THE EVIDENCE, YOU ARE FIRMLY CONVINCED THAT THE ACCUSED IS GUILTY OF THE CRIME CHARGED, YOU MUST FIND HIM GUILTY." WAS THIS PLAIN ERROR? This supplemental AOE was inadvertently styled as AOE (4) instead of AOE (3). Regardless, in accordance with our holding in *United States v. Rendon*, __M.J. __, 2016 CCA LEXIS 643, at *26 (N-M. Ct. Crim. App. 1 Nov 2016), we summarily reject the supplemental AOE. *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992).

Having carefully considered the record of trial, oral argument, and the pleadings, we find no error materially prejudicial to the appellant and affirm the findings and sentence below.

## I. BACKGROUND

At around 2200 on 4 October 2012, Ms. VAM and her coworker visited the barracks located on board Camp Pendleton, California, to meet up with her coworker's boyfriend, a Marine. VAM was introduced to the appellant, and the four of them—VAM, her coworker, her coworker's boyfriend, and the appellant—socialized in the appellant's room for several hours. VAM and her coworker then made their "good byes" and returned to the coworker's home.

At around 0300, VAM's coworker received a text message from her boyfriend asking her to come back to the barracks for the night. VAM accompanied her, uncomfortable with her friend driving back to the base alone so late at night. They again met up in the appellant's room, finding the appellant extremely intoxicated. Shortly thereafter, VAM and the appellant were left alone in the room when her coworker and her coworker's boyfriend left.

At around 0330 the appellant asked for VAM's help to find his phone. She complied, calling him from her phone to hear it ring. Immediately after this, the appellant moved behind her and began removing her clothing. Ignoring her pleas to stop, the appellant pushed VAM onto his bed and forced her to engage in vaginal and anal intercourse. Afterwards, VAM dressed and lay awake in the room's other bed until around 0630 when the appellant departed for morning muster.

VAM reported the assault that evening. A subsequent medical exam revealed injuries to VAM's vagina and rectum. She had large bruises on her breast and arm. The appellant's DNA was discovered on VAM's body and in the crotch of her underwear, and VAM's DNA was discovered in the crotch of the appellant's underwear.

## II. DISCUSSION

### A. Denial of the defense's request for continuance[5]

The case was referred to a general court-martial on 26 June 2013, and trial was set for 21 October 2013. However, on 8 October 2013 the military judge granted a continuance until 27 January 2014 due to the

---

[5] Raised as AOE (1).

unavailability of VAM's coworker, who was a potential defense witness.

In mid-December 2013, the defense requested the government subpoena VAM's phone and text message records based on apparent discrepancies between VAM's previous statements and the forensic evaluation of her cell phone. The government agreed and subpoenaed the records from VAM's service provider, AT&T, the day after the defense request.

When, by 22 January 2014, the records still were not available, the defense requested an open continuance until the records could be produced. As a substitute for the AT&T records, VAM voluntarily provided a copy of her phone bill for the relevant time period. The bill showed 86 text messages between VAM and an unknown individual beginning on the evening of 4 October 2012 and ending at 0252 on 5 October 2012, about 30 minutes before the assault.

Applying *United States v. Miller,* 47 M.J. 352 (C.A.A.F. 1997), the military judge denied the appellant's continuance request, crediting in part his belief that, "there's already sufficient basis in the record for many levels of impeachment of the victim."[6]

By trial, the defense had identified the unknown text messenger as Mr. DMN. While defense counsel was unable to communicate with DMN before trial, he did cross-examine VAM on her interactions with him:

> Q. [civilian defense counsel]. Around 10:00 p.m. [on 4 October 2012]. Had you made any plans to see anyone else that evening?
> A. [VAM]. No.
>
> Q. Okay. Were you texting with anybody that evening?
> A. Probably.
>
> Q. If you were texting with somebody that evening, who do you think that was?
> A. It could have been quite a few people.
>
> Q. Okay. Is it possible that you were texting with only one person that evening?

---

[6] Record at 235.

A. I believe I was texting a few more than one person that evening.

Q. Okay. If I tell you a phone number, I just want to see if you recognize a particular number . . .
A. I'm sure that I know the number, but I don't know who it belongs to.

Q. Okay. Just as you are sitting here, you don't recognize that number?
A. Right.[7]

Later, counsel returned to this line of attack:

Q. Do you recall whether or not you were texting repeatedly one person throughout that evening?
A. I'm sure that I was, but I don't remember specifically who it was.

Q. Okay. Does the name [DMN] ring a bell?
A. No.

Q. You are not reminded --
A. I know a few people [with that first name]. I'm not sure of last names.

Q. Okay. The name . . . would have a really kind of unusual spelling?  . . . Is that --
A. I don't know how to spell -- I don't pay attention to the spelling of my friends' names.[8]

The defense counsel also cross-examined the Naval Criminal Investigative Service (NCIS) special agent, who originally questioned both VAM and her coworker, regarding their interactions with DMN:

Q [civilian defense counsel]. Did you -- did any part of the investigation deal with an issue of whether or not between the time that [VAM] alleges that she was at

---

[7] *Id.* at 682.

[8] *Id.* at 690.

Camp Pendleton the first time when she leaves with [her coworker] and then comes back the second time where the alleged assault takes place[?] Did you take any investigations regarding that period of time?

A [NCIS special agent]. Other than interviewing her friend that was with her, no.

. . . .

Q. . . . You had a disconnect in the statement of one witness and another witness as to the issue of whether or there [sic] was a third party that they met with between the visits to Camp Pendleton.

A. Correct.

Q. Right?
A. Correct.

Q. One witness is saying, yes, we did. We hung out with him for a while, and one is saying, that [n]ever happened at all.

A. Correct.

. . . .

A. [The coworker] says that there was – I mean, our – [VAM] says that she never met anybody at her house on that date.

Q. She says they didn't – she says that they did not –
A. Correct.

Q. But [the coworker] said that they did, didn't she?
A. Correct.[9]

. . . .

---

[9] *Id.* at 582-84.

Q. Through midnight all the [sic] up to 2:52 a.m. that [VAM] was texting and exchanged 86 texts sent and received with this person. Would that surprise you to know that?

A. Yes.[10]

This point was reiterated by the defense counsel during closing argument:

What about the differing accounts between [the coworker] and [VAM]? Remember, they were having a – there was a disconnect in NCIS's mind whether or not between the two trips to Pendleton they might have met another man. Okay, significant, insignificant, don't know, but it was a story in which [VAM] is saying one thing and another witness is saying another.[11]

Neither VAM's coworker nor the coworker's boyfriend testified at trial, and the question of the third man was not raised other than as a point of inconsistency in VAM's testimony.

On 10 July 2015 the record was returned for a *DuBay* hearing to explore the content and availability of evidence about the 86 text messages exchanged between DMN and VAM. On 3 February 2016 the record was returned for an additional *DuBay* hearing to explain the content of VAM's phone record produced by AT&T at the first *DuBay* hearing.

During those hearings, the *DuBay* judge determined that DMN and VAM exchanged texts on 4 and 5 October 2012 after meeting through an online dating service.[12] DMN was active in online dating and regularly communicated with and dated the women he met online. DMN typically engaged the women he met in a series of "20 Questions," texting questions ranging from innocuous to provocative in order to gage whether there was mutual interest.[13]

DMN and VAM began messaging each other on 4 October 2012 at 1913 and exchanged text messages with regularity (some 80 messages back and forth) until 5 October 2012 at 0252. DMN then texted VAM

---

[10] *Id.* at 622.

[11] *Id.* at 910.

[12] We will accept the factual findings of a *DuBay* military judge unless they are clearly erroneous. *United States v. Brownfield*, 52 M.J. 40, 44 (C.A.A.F. 1999).

[13] Appellate Exhibit (AE) LXXIII at 2.

later that evening at 2123 and again a day later at 1345.[14] He received no response to either message.

DMN did not recall that any of their messages discussed the appellant or related to anything of a sexual nature.

DMN regularly deleted his text messages within a few weeks of the other person appearing to lose interest. When asked about the chances that he would still have copies of the text messages between him and VAM by the time of the appellant's court-martial, he responded, "slim to none" and "almost impossible."[15] Likewise, Verizon—DMN's service provider—maintained text message content for only three to five days, and AT&T didn't maintain text message content at all.

A review of the records of activity for VAM's phone showed an exchange of messages with DMN on 5 October 2012 ending at 0252. There were no additional text messages until her phone received an incoming message at 0912 later that morning. VAM's phone placed one call to the appellant's phone on 5 October 2012 at 0332 that lasted for 17 seconds but was not answered. Her phone did not send or receive another call until an incoming call was placed at 0709 later that morning. VAM's phone electronically transferred data on 5 October 2012 at 0249 for around 30 minutes. No other data transfer occurred until after 1130 later that morning. According to the records, VAM's phone wasn't used between 0332 and 0730 on 5 October 2012.[16]

Regardless, the appellant still maintains that the military judge abused his discretion in denying the defense's second continuance request and that this denial prejudiced the appellant's ability to confront VAM about contradictions between her testimony, her phone records, and DMN's statement.

At trial, the appellant shoulders the burden by a preponderance of the evidence to show "reasonable cause" for the continuance request, *United States v. Allen,* 31 M.J. 572, 620, 623 (N.M.C.M.R. 1990), *aff'd,* 33 M.J. 209 (C.M.A. 1991), and we will reverse a military judge's decision on a continuance request only for an abuse of discretion. *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F. 1997). However, we need not decide whether the military judge abused his discretion if we first resolve that the appellant was not prejudiced by the denial of a

---

[14] *See* AE LXIX at 4.

[15] First *DuBay* Record at 44.

[16] *See* AE LXXXIV.

continuance. *United States v. Wellington,* 58 M.J. 420, 425 (C.A.A.F. 2003). For non-constitutional error,[17] the appellant is warranted relief only when he demonstrates that the error materially prejudiced a substantial right. Art. 59(a), UCMJ, 10 U.S.C. § 859 (2012).

Here the appellant was not materially prejudiced by the denial of the continuance as the matters that might have been discovered with the addition of time would have been cumulative and of no more use than what was already available to them at trial.

The phone records and explanative testimony provided at the *DuBay* hearings closely corroborated VAM's testimony at trial. From before 0300 to after 0730 on 5 October 2012, VAM made use of her phone only once—the call she made to the appellant's phone at 0330, moments before the assault occurred. Otherwise, she made no other calls, exchanged no text messages, and received no data indicative of other smart phone usage. This is wholly consistent with her description of the attack.

Similarly, DMN's testimony at the *DuBay* hearing was largely consistent with VAM's trial testimony. Neither DMN nor VAM appeared to remember the other with any great specificity, corroborative of a short-term, online encounter that failed to develop much further. At the *DuBay* hearing, DMN vaguely recognized pictures of VAM and her coworker as the same two women he visited

---

[17] We recognize that, in some cases, the denial of a continuance may impact an appellant's meaningful opportunity to present a complete defense. Under such circumstances where the appellant's Sixth Amendment guarantee to the effective assistance of counsel is infringed, we test for harmlessness beyond reasonable doubt. *See Kansas v. Ventris*, 556 U.S. 586, 590 (2009) (holding that the Sixth Amendment right to counsel includes "the opportunity for a defendant to consult with an attorney and to have him investigate the case and prepare a defense for trial") (citation and internal quotation marks omitted); *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (holding that the right to counsel extends to the "'meaningful opportunity to present a complete defense'") (quoting *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)); *Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). *But see United States v. Bartlett*, 66 M.J. 426, 430 (C.A.A.F. 2008) ("There is a strong presumption that an error is not structural," meaning that most are not significant enough to entirely "obviat [e] the need to show prejudice" at all) (citing *Rose v. Clark*, 478 U.S. 570, 579 (1986)).

Under the circumstances of this case, we find the right to the effective assistance of counsel was not implicated by the military judge's ruling, and we apply the prejudice standard applicable to non-constitutional error.

one night in the fall of 2012 when the three socialized at a house, briefly went shopping, and made food back at the house before he was ushered out unceremoniously. However, DMN's memory and description of that meeting did not correlate with the frequency of his text messages with VAM as reflected in the AT&T records for 4 and 5 October 2012, making it very unlikely that this meeting occurred on the night of 4 October 2012. Regardless, he never saw either woman again after that meeting. Likewise, VAM denied making plans to meet with DMN—or anyone else—in between visits to Camp Pendleton on 4 October 2012.

DMN's vague memory of meeting VAM and VAM's denial of meeting anyone the night of 4 October 2012 were arguably contradictory. And the defense made much out of this proposed contradiction; challenging the victim twice on the matter, examining the NCIS special agent at length about it, and raising it again during closing argument. However, despite previously characterizing the defense's cross-examination on this matter as "devoid of impeachment value,"[18] it now appears that all possible value was extracted from the possible contradiction, and further investigation has yielded nothing else of relevance. Sometimes when life gives you lemons, you can only make lemon juice.

## B. Post-trial ineffective assistance of counsel[19]

In an unsworn declaration submitted to the court on 30 October 2014, the appellant alleged that, while meeting with his trial defense counsel for the purpose of preparing an appellate rights statement prior to the announcement of sentence, he instructed counsel to request deferment of any sentence to confinement and reduction in pay grade. This desire was reflected in a statement dated 30 January 2014 and signed by the appellant and his three trial defense counsel.[20]

On 11 June 2014, the trial defense counsel submitted a robust request for clemency which included thirty enclosures and requested the CA set aside the findings or, in the alternative, reduce the term of confinement or the dishonorable discharge. However, neither the defense's clemency request, nor the accompanying letter from the appellant, requested deferment of confinement or reduction in grade. On 19 May 2014, prior to submission of defense's clemency request, the

---

[18] *Montalvo*, 2015 CCA LEXIS 218, at *16.

[19] Raised as AOE (2).

[20] Motion to Attach Affidavit of the Appellant of 30 Oct 2014, Appendix 2.

staff judge advocate (SJA) provided his recommendation to the CA, but noted that, "[t]here have been no requests to defer any part of the sentence . . . ."[21] The 16 June 2014 addendum to the SJA's recommendation was silent on any deferment requests. On 18 June 2014, the CA approved the sentence as adjudged noting that he had received no requests to defer any part of the sentence.

The Sixth Amendment right to effective assistance of counsel at courts-martial is a fundamental right of service members. *United States v. Knight*, 53 M.J. 340, 342 (C.A.A.F. 2000) (citing *United States v. Palenius*, 2 M.J. 86 (C.M.A. 1977)). That right extends to post-trial proceedings. *United States v. Cornett*, 47 M.J. 128, 133 (C.A.A.F. 1997). Ineffective assistance of counsel involves a mixed question of law and fact, but whether counsel was deficient and whether the deficiency was prejudicial are reviewed *de novo. United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001); *see also United States v. McClain*, 50 M.J. 483, 487 (C.A.A.F. 1999).

We apply the two-prong test set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984) to determine whether counsel rendered ineffective representation. "The burden on each prong rests with the appellant challenging his counsel's performance." *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005). The first prong requires the appellant to show that counsel's performance fell below an objective standard of reasonableness, indicating that counsel was not functioning as counsel within the meaning of the Sixth Amendment. *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002). Our review of counsel's performance is highly deferential and is buttressed by a strong presumption that counsel provided adequate representation. *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004).

The second prong requires a showing of prejudice resulting from counsel's deficient performance. *Strickland*, 466 U.S. at 687. With regards to post-trial claims of ineffective assistance of counsel, courts must give an appellant the benefit of the doubt and find that "there is material prejudice to the substantial rights of an appellant if there is an error and the appellant 'makes some colorable showing of possible prejudice.'" *United States v. Wheelus*, 49 M.J. 283, 289 (C.A.A.F. 1998) (quoting *United States v. Chatman*, 46 M.J. 321, 323-24 (C.A.A.F. 1997)). If the appellant fails to make a "colorable showing of possible

---

[21] SJA Recommendation at 2.

prejudice," we need not determine whether trial defense counsel's performance was so deficient as to render him ineffective.[22]

In general, deferment of a sentence to confinement or reduction in grade "is a postponement of the running of the sentence." RULE FOR COURTS-MARTIAL (R.C.M.) 1101(c)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.) Deferment is not a form of clemency.[23] The appellant has the burden of demonstrating that his interest and the interest of the community in deferral outweigh the community's interest in imposition of the punishment on its effective date. R.C.M. 1101(c)(3). Factors to consider in determining whether to defer a sentence to confinement or reduction in grade include: the probability of flight; the probability of the commission of other offenses, intimidation of witnesses, or interference with the administration of justice; the nature of the offenses including the effect on the victim; the sentence adjudged; the command's immediate need for the accused; the effect of deferment on good order and discipline; and the accused's character, mental condition, family situation, and service record. *Id.*

Here, the appellant has provided little upon which a decision to defer his sentence to confinement or reduction in grade might have been based.[24] Absent such evidence, and given the nature of the offenses of which the appellant was convicted and his sentence to nine years' confinement, we conclude that there has not been a colorable showing of possible prejudice.[25]

---

[22] *See United States v. Datavs*, 71 M.J. 420, 424-25 (C.A.A.F. 2012) (noting that courts are not required to determine whether counsel's performance was deficient before first examining whether the appellant suffered any prejudice).

[23] R.C.M. 1101(c)(1), Discussion.

[24] *See Unites States v. Nicks*, No. 20110658, 2013 CCA LEXIS 789, *5-9, unpublished op. (A. Ct. Crim. App. 30 Sep. 2013) (providing a helpful discussion of the R.C.M. 1101 factors as they relate to requests for deferment and waiver of forfeitures). Moreover, simply indicating clemency desires on an appellate rights form does "not set forth a *prima facie* case of ineffective assistance of counsel." *United States v. Axtell*, 72 M.J. 662, 664-65 (A. Ct. Crim. App. 2013) (en banc).

[25] *Nicks*, 2013 CCA LEXIS 789, at *8-9 (holding that the "[a]ppellant's silence on appeal regarding the R.C.M. 1101(c)(3) burden and the factors articulated therein leads to but one conclusion: [the] appellant has failed to make a colorable showing of possible prejudice").

## III. CONCLUSION

The findings and the sentence, as approved by the CA, are affirmed.

For the Court



R.H. TROIDL
Clerk of Court